**DILLE v. CARTER OIL CO. et al.**

No. 4197.

United States Court of Appeals
Tenth Circuit.

Oct. 31, 1951.

792

---

Robert D. Hudson, Tulsa, Okl., (Haskell Paul, Pauls Valley, Okl., and O. C. Essman, Tulsa, Okl., on the brief), for appellant.

Gentry Lee, Bartlesville, Okl., (John M. Winters, Jr., Tulsa, Okl., on the brief), for appellee Zephyr Petroleum Co.

A. W. Trice, Ada, Okl., for appellee W. A. Delaney, Jr.

Before PHILLIPS, Chief Judge, and BRATTON and MURRAH, Circuit Judges.

MURRAH, Circuit Judge.

This action was commenced by the Carter Oil Company against Glen S. Dille, W. A. Delaney, Jr. and the Zephyr Drilling Company, for a declaration of the rights of the parties under a contract entered into between Carter, Delaney and Zephyr. When Delaney and Zephyr cross-claimed against codefendant Dille, and Dille stated in open court that he claimed no interest adverse to Carter, the trial court dismissed the action for lack of diversity of citizenship between the parties to the controversy. Delaney and Zephyr appealed, and this court reversed, holding that the trial court had jurisdiction of the declaratory action. De-

laney v. Carter Oil Co., 10 Cir., 174 F.2d 314. Dille then filed his answers to the respective cross-claims of Delaney and Zephyr and counterclaimed against them. His counterclaim is based upon an alleged oral agreement, whereby, in exchange for scientific and geological data, he was to receive an interest in the oil and gas leases covered by the contract between Carter, Delaney and Zephyr. And, to enforce that alleged contract, he sought to impress a constructive trust upon the interest held by Zephyr and Delaney. Upon a trial of the case on the merits, the court held that Dille had no right, title or interest in the properties, and this is an appeal from that judgment. The ultimate question is whether there was sufficient evidence to support the findings of the court.

On March 5, 1946, Carter, Delaney and Zephyr entered into a written contract, by the terms of which Carter acquired a 60 per cent interest in a block of oil and gas leases located in Garvin County, Oklahoma, the record title to which was held by Delaney and Zephyr. In consideration therefor, Carter agreed to pay the sum of $25,000 and to drill a well at its expense to a designated depth. In the event the test well was a producer, the contract set out the rights, duties and obligations of the parties as to future development. Pursuant to the contract, Carter completed a producing well on the leases in October 1946. During the period from the completion of this test well and the commencement of this suit in May 1948, fifteen producing wells and four dry holes had been drilled, and three wells were being drilled. Carter brought this declaratory action when it learned that Dille was claiming some interest in the leases. Since Dille now claims no interest in the undivided 60 per cent interest held by Carter under the contract, the issue here is between Dille and his codefendants, Zephyr and Delaney, involving the ownership of the undivided 40 per cent interest retained by them.

The testimony of Dille, in support of his alleged oral agreement with Zephyr and Delaney, is as follows: Dille, a geologist residing in Tulsa, Oklahoma, while working for the Texas Company in 1936, be-

came interested in the geological formation of the Arbuckle Mountains in Southern Oklahoma, and spent considerable time in that area. He also studied published works in connection with the geological structures in that vicinity. This work took him to Garvin County, where he was attempting to trace a fault line in the structure, and he came upon a certain map prepared by a Mr. Becker, showing the location of the fault line. In addition to this information, he obtained data concerning subsurface formations from samples and well logs from the Corporation Commission of the State of Oklahoma, and studied photographs of aerial surveys and data from the United States Geological Survey. Dille left the Texas Company in 1936, and became a consulting geologist, accepting professional employment from various persons and firms engaged in the business of exploring for oil and gas. He continued to study the geological data on the structure in Garvin County, and in 1939, decided to assemble a block of oil and gas leases there, later known as the Katie area. He arranged to have Don Matthews, a Tulsa lease broker, check the acreage, and learned that most of it was already under five and ten year oil and gas leases to the Lee Drilling Company. When the records were checked again in 1941 by Matthews, the leases were still in effect, but upon further examination in 1943, it was found that a number of the leases had been released. At that time, Dille obtained a geological map of the area, referred to as as the Heatherington Map, from the Lee Drilling Company, and also learned that the Drilling Company had been unable to promote the block. Dille stated that in all his research, he had found no geologist who had concluded the important geological factor determined by him that in one place in the area, the lower Pontotoc formation protruded up through the upper Pontotoc.

In 1938, Dille became acquainted with S. C. Canary, an officer of the Zephyr Drilling Company, and from that time until 1944, did considerable work for Zephyr, for which he was usually paid a fee of $50 a day plus expenses while on trips. In 1944, Canary asked Dille to accompany him on a trip to Southern Oklahoma, for the purpose of looking for acreage to develop. When Canary found nothing to interest him, Dille told him of the considerable amount of work he had done in the Katie area in Garvin County, and explained to him why he thought the structure was productive; he told him of the various maps and data he had assembled, and suggested that Zephyr join him and Matthews in procuring a block of oil and gas leases; he proposed that Zephyr pay for the leases and he and Matthews would promote and sell the block. On the return trip to Tulsa, Canary suggested that Dille make a map showing the general picture of the development in that country, which he later did, covering an area of 186 square miles. Dille was paid his usual fee by Zephyr for this trip to Southern Oklahoma, and for the subsequent preparation of the map.

On May 31, 1944, Canary told Dille that Zephyr would go in on the deal, and that when Zephyr had recovered the amount spent by it to assemble the block, they would own it "fifty-fifty". Matthews was requested to start taking the leases, and after taking three, he made arrangements with a lease broker in Pauls Valley, Oklahoma, to obtain the remainder. The leases were sent to a bank in Tulsa for Zephyr with draft attached. Some time later, Dille again went to Southern Oklahoma with Canary, to do some geological work on a well being drilled by Delaney near Ada, Oklahoma, in which Zephyr owned a one-half interest. On that trip, they stopped in Pauls Valley and made arrangements for a firm of attorneys to examine the title to the oil and gas leases that were taken in the Katie area, and also talked with the lease broker there about the progress in procuring the leases. Canary remarked that it was costing more than he had anticipated to get the block of leases, and asked Dille if he would object to having Delaney in on the deal on the basis of one-third interest to each. Dille said that would be all right with him, and later in the day Canary told Delaney about the deal. Delaney said he would come into it if his geologist, Byron Sledge, would approve it. Sledge and Dille left immediately for the Katie area, and when Sledge subsequently made a favorable report, Delaney agreed to join the venture. He told Canary he had a lease

man in Ada that he would put on the job in order to get the leases faster. The leases were taken in the name of Zephyr and Delaney.

In September 1944, Dille formed a connection with the Deep Rock Oil Company and did no more work for Zephyr, however he inquired from time to time about the progress of assembling the block in the Katie area. In 1945, Canary informed Dille that the block was completed, and that he would like to offer it to Deep Rock for $25,-000 and a test well. Dille informed Canary later that he had been unable to interest Deep Rock in the proposition. In March 1946, Dille learned through an oil service publication that Delaney and Zephyr had made a deal with the Carter Oil Company on the block. While the test well was being drilled by Carter, Dille would ask about it whenever he saw Canary, and on one occasion, Canary told him "By the way, I will send you over a letter setting out our deal." Dille received the following letter dated September 23, 1946, signed by Zephyr and Delaney: "You have furnished to the undersigned certain geological information about the area hereinafter described in Garvin County, Oklahoma, with the understanding you would be compensated out of oil as set out hereinafter. Confirming our oral agreement, the undersigned agrees to pay, or cause to be paid, to you the sum of $7,500, payable solely and only out of an undivided 1/16th of the 7/8ths working interest oil and or gas that may be produced and sold under oil and gas leases owned by the undersigned and covering * * * [640 acres] * * *. It is further understood that such payment is to be made solely from such fractional interest * * * free and clear of any cost of development or operation to you, and there shall be no other liability on the undersigned. If this is your understanding, please signify in the space provided and return two copies hereof to us." Dille kept the letter for quite some time as he was undecided about signing it, but after he noticed that the oil payment covered only the acreage included in the drill site of the test well, he signed and returned it, with the idea that other such letters would be forthcoming as additional wells were drilled on the other leases.

Thereafter, on November 22, 1947, Dille wrote Zephyr, calling attention to their agreement concerning the block of leases, stating "my part of the agreement was that I furnish the geological information, and you, or your Company would furnish the money necessary to purchase the leases. My compensation was to be an oil payment under the block of acreage which you assembled." The letter went on to state that it was understood that he was a partner in the venture and would receive oil payments under the leases; he called attention to the fact that the letter of September 23, 1946 to him described only a small portion of the leases, and stated that he felt he was entitled to $750,000 out of the 40 per cent interest held by Zephyr and Delaney.

On cross-examination, Dille testified that he had received his usual fee of $50 a day for each of these trips with Canary; that over the period of years, he had several deals with Zephyr in which he had an interest, and in every case they had been reduced to writing. In referring to the alleged agreement here, he stated "I know that such an agreement should be reduced to writing and thought it would be." The general map which he prepared of the area for Zephyr, for which he was paid, did not disclose any geological information, but only activity, such as drilling locations, dry holes and other generally available information. Letters were introduced in evidence showing that Dille was on very friendly terms with Delaney and Canary during all of this time until November 1947, when Dille wrote the letter asking for $750,000. Dille admitted that he had never discussed his alleged interest in the venture with Delaney, nor the matter of allocation of overhead expenses and cost of equipment. He stated that although he received pay for his trips with Canary, he had never received any actual fee for his geological services in connection with the lands involved, except the oil payment of $7,500.

Matthews, the lease broker, testified that when he talked to Canary about procuring the leases, Canary stated that he and Dille had made a deal on the area; that he had an arrangement with Dille whereby

they were to have an interest in the property together, and that Dille had paid him one-half of the $7,500 oil payment. When asked whether $150.00 paid to him by Zephyr was for services in taking three leases, he stated "I don't think it was", and remarked that he considered it reimbursement for expenses.

The Manager of the Exploration Department of the Carter Oil Company testified that no consideration was given to any geological information submitted by Delaney and Zephyr with reference to the area, and that the test well was drilled solely on the basis of Carter's independent work.

The testimony of Canary corroborates that of Dille in many respects, but is sharply conflicting on vital points. He denied emphatically that Dille made any mention of the Katie area on the trip to Southern Oklahoma, and said that the deal was first presented to him by Matthews in the latter part of May 1944, at which time Matthews, not Dille, showed him the Becker map. He stated that he took the map to Dille and asked him what he thought of the deal; that he could not recall whether at that time Dille said anything concerning his previous study of the area, and that as far as he knew, Dille's first trip to the Katie area was with Delaney's geologist, Sledge.

Concerning the circumstances surrounding the $7,500 oil payment to Dille, Canary testified substantially as follows: In June 1944, after Delaney had agreed to come into the deal, Canary and Dille left Ada, and on the way back to Tulsa, Dille again brought up the subject of the fault in the structure of the Katie area, and stated "if that thing produces over there, I would like to make a little money out of it." He stated that he would like to have a lease, royalty or oil payment for five or six thousand dollars, and Canary told him he would think about giving him an oil payment. In December 1945, when Canary was trying to interest Deep Rock in the block, Dille told him that they had shot the area and the resulting information was not favorable. Nothing was said in that conversation about Dille claiming an interest in the block. In August 1946, Canary met Dille on the streets of Tulsa, and told him that the drill

stem tests looked good on the well being drilled by Carter, and reminded him that Zephyr might soon be in a position to give him the oil payment. And, when he saw Dille again in September 1946, he told him that they were ready to give it to him. Dille said that he would like to have $5 per acre on the 1500 acres, but rather than "clutter up" all the leases, it was decided that the $7,500 oil payment would cover the 640 acres where the test well was being drilled. Delaney agreed to the oil payment, and Canary accordingly had his lawyer draft the letter of September 23, 1946 to Dille. In commenting on the motive which prompted him to give Dille the oil payment, Canary stated "The reason I delivered the letter to Dille was because I had always thought a lot of him. We had been through a lot of pretty tough going, sitting on wells, drilling wildcats, had interests with him, none of which proved to be any good, and this was one of the opportunities where it looked like we might have a chance to give him some recompense for his past work. * * * we were feeling pretty good about the well." Thereafter, Dille did not approach Canary or Delaney regarding any asserted claim in the block, and the first notice Zephyr had of such a claim was Dille's letter to it dated November 22, 1947.

The testimony of Delaney seems to corroborate that of Canary on each crucial point. He stated that nothing was ever said about Dille having an interest in the block; that during the time the well was being drilled and subsequent to its completion, Dille never inquired of him about it, nor did he ever show any interest in the development of the details.

Freeman, the lease broker at Pauls Valley, testified that he did not know anyone in the deal except Canary and Matthews; and that when Matthews stepped out, he never asserted to him that he claimed any financial interest in the block. Byron Sledge testified that when he made his first visit to the Katie area with Dille, there was nothing about Dille's actions to indicate that he had been there before; that his purpose in going on the trip with Dille was to confirm the Becker map and make his report to Delaney. He knew nothing of an

agreement whereby Zephyr, Delaney and Dille would each own a one-third interest in the block.

It is contended by Dille that the evidence conclusively establishes a constructive trust in the 40 per cent record interest of Delaney and Zephyr, and that the trial court erred in not so holding. He takes the position that through his studies as a geologist, he came into possession of certain scientific and geological information, which he in confidence disclosed to Zephyr and Delaney for the purpose of having them join him in the development of the area; that such disclosures created a fiducial relationship between the parties, as to which Delaney and Zephyr were obligated to exercise the utmost good faith.

 Of course if, as Dille contends, Zephyr and Delaney converted confidential geological data belonging to Dille, and obtained from him under an agreement to use it for their mutual profit, equity will raise a constructive trust to facilitate restitution, for it would be inequitable to allow them to be thus unjustly enriched. Ohio Oil Co. v. Sharp, 10 Cir., 135 F.2d 303; Ballard v. Claude Drillling Co., 149 Kan. 506, 88 P.2d 1021; Restatement Restitution, Sec. 200. Or, if the evidence satisfactorily establishes an agreement to enter into a joint venture for the exploration of the area, Dille furnishing the geological data and Zephyr and Delaney the financial resources, the court will enforce the bargain whether the information was confidential or not. This is so because equity is as quick to enforce a trust based upon a fiducial relationship sounding in contract as it would one growing out of information surreptitiously or wrongfully obtained. Kasishke v. Baker, 10 Cir., 146 F.2d 113; Kasishke v. Keppler, 10 Cir., 158 F.2d 809. Either is based upon the fundamental theory of restitution for unjust enrichment. Restatement Restitution, Sec. 160. In any event, the heavy burden is upon Dille to establish a contract of which the trial court will take equitable cognizance, or prove that the information was confidential; that it rightfully belonged to him; and that it was wrongfully converted by Zephyr and Delaney to their profit or advantage.

 Dille's testimony indicates an oral agreement for a joint venture in which the coadventurers were to share alike in the profits. His writings negative any intention to form a joint venture, instead they indicate that he expected an oil payment for a stipulated amount as full compensation for his services or for the data furnished. The two theories are irreconcilably inconsistent. Under one theory he would be a partner, under the other an employee or vendor of information for stated compensation. But, we need not decide on which theory he must stand or fall or which is most favorable to him under the proof, for the trial court has made conclusive findings against him on both. The court specifically found that no geological information was given to Zephyr or Delaney by Dille in confidence or under any agreement that it was supplied with the intent that it be used to mutual advantage in developing the oil and gas leases in question. It further found that there was never any agreement between Zephyr and Dille or Delaney and Dille to the effect that Dille would receive an interest in the leases in return for the geological information. These findings are adequately supported by competent evidence, and are conclusive of all issues raised by the pleadings. The judgment is affirmed.